USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6 - 15 -10_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

UNITED STATES OF AMERICA,

                Plaintiff,

          v.

EDUCATIONAL BROADCASTING
CORPORATION and WNET.ORG,

                Defendants.

------------------------------------------------------------ x

STIPULATION AND ORDER OF
SETTLEMENT AND DISMISSAL

10 Civ. 4664 (PKC)

ECF Case

## I.   PARTIES

This Stipulation and Order of Settlement and Dismissal ("Stipulation and Order") is

entered into by the United States of America (the "United States" or the "Government") by its

attorney Preet Bharara, United States Attorney for the Southern District of New York, on behalf

of the National Science Foundation Office of Inspector General ("NSF OIG"), the National

Endowment for the Arts Office of Inspector General ("NEA OIG"), and the National Endowment

for the Humanities Office of Inspector General ("NEH OIG"), and the Educational Broadcasting

Corporation, ("EBC") and WNET.ORG (collectively, "Defendants"), through their authorized

representatives.

## II.   PREAMBLE

As a preamble to this Stipulation and Order, the parties agree to the following:

A.      EBC is a New York Regents chartered educational corporation with offices

located in New York City.  EBC produces and broadcasts educational public television programs.

B.      WNET.ORG, also a New York Regents chartered educational corporation, was

organized on April 15, 2008. WNET.ORG is the parent and sole member of EBC, which is a wholly-owned subsidiary of WNET.ORG.

      C.      Between June 2002 and September 2007, the National Science Foundation ("NSF") awarded EBC five grants (ESI-0206195, ESI-0307763, ESI-0407065, ESI-0540279, and DRL- 0638962) for the production of five seasons (seasons two through six) of the television series *Cyberchase* (the "NSF grants"). Between September 2001 and September 2005, the National Endowment for the Humanities ("NEH") awarded two grants to EBC (GN-50495-05 and GN-26277-01) for the production of two television programs: *Audubon: Drawn from Nature* and *The American Novel* (the "NEH grants"). Between July 2005 and January 2008, the National Endowment for the Arts ("NEA") awarded two grants to EBC (05-3446-7128 and 05-3446-7111) for the production of two television series: *American Masters* and *Great Performances* (the "NEA grants").

      D.      The United States contends that during the time periods referenced in Paragraph C above, in connection with EBC's submission of requests for reimbursement for certain expenses, in violation of the False Claims Act, 31 U.S.C. §§ 3729 - 3733 (the "False Claims Act"), EBC knowingly presented, or in deliberate ignorance of or in reckless disregard for the truth presented, or caused to be presented, false or fraudulent claims to the United States for payment, and/or submitted false statements or information to the United States to get a false or fraudulent claim paid, as more specifically set forth in the United States' Complaint (the "Complaint").

      E.      Alternatively, the United States contends that it has certain civil claims against EBC based on common law or equitable theories of fraud and mistake of fact for engaging in the

2

conduct described in Paragraphs C and D above and as described in more detail in the Complaint. The conduct outlined in this Preamble and the Complaint shall be referred to as the "Covered Conduct." The United States also contends that it has claims for certain injunctive and prospective relief against Defendants.

F.      Defendants hereby appear and consent to the entry of this Stipulation and Order, but do not admit to any wrongdoing or liability as alleged in the Complaint.

G.      To avoid the delay, expense, inconvenience and uncertainty of protracted litigation, the parties desire to reach a full and final settlement and compromise of the claims that the United States asserts in the Complaint in this action.

NOW, THEREFORE, the Government, EBC and WNET.ORG, in consideration of the mutual promises, obligations, undertakings and commitments set forth in this Stipulation, do hereby covenant and agree as follows:

1.      The parties consent to this Court's exercise of subject matter jurisdiction over this action and personal jurisdiction over each of them.

2.      Within three (3) business days after entry of this Stipulation by the Court, EBC shall pay to the United States, in full compromise and satisfaction of the allegations set forth in the Complaint, the sum of nine hundred fifty thousand dollars ($950,000) (the "Settlement Amount"). This Settlement Amount shall constitute a debt due and owing upon entry of this Stipulation and Order by the Court and is to be discharged by payment to the United States. If EBC fails to pay the Settlement Amount when due, a judgment (in the form attached hereto as Exhibit A) shall be entered against EBC and in favor of the United States for the sum of nine

3

hundred fifty thousand dollars ($950,000).

3.     EBC shall make payment of the Settlement Amount by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office, Southern District of New York.

4.     EBC shall relinquish and forego thirteen percent (13%) of the reimbursements set forth in the Unreimbursed Expenses Incurred with respect to each of the grants as described in the chart attached hereto as Exhibit B (the "Exhibit B Grants"), shall apply for reimbursement of the Unreimbursed Expenses Adjusted at 87%, and NSF, NEA, and NEH shall de-obligate the relinquished Exhibit B Grant funds in accordance with Exhibit B. Such relinquishment by EBC and de-obligation by NSF, NEA and NEH shall not affect the remaining Award Funds Available for Subsequent Expenses for each of the Exhibit B Grants as reflected on Exhibit B. In consideration of EBC's relinquishment of claims for reimbursement for such portion of the expenses previously incurred with respect to the Exhibit B grants, the United States (on behalf of itself and its agencies, departments, officers, employees, servants and agents) shall not assert violations by EBC with respect to reimbursement of such expenditures under the False Claims Act or under the common law or equitable theories of fraud or mistake of fact.

5.     With respect to the Exhibit B Grants, EBC hereby certifies that any funds to be paid to it as listed in the column titled Unreimbursed Expenses Adjusted at 87% represent reimbursement for funds that have already been expended by EBC and do not include reimbursement for any costs that have yet to be incurred. EBC further certifies that the funds relinquished are not connected to any reduction in the scope of any of the projects covered by the

4

Exhibit B Grants.  Finally, EBC certifies that the chart attached hereto as Exhibit B accurately represents the grants identified in Paragraph 4 above and the amounts EBC will receive in reimbursement from those grants.

6.      Defendants shall adhere to the Compliance Plan, attached hereto as Exhibit C, designed to ensure further that the conduct of Defendants and their employees will comply with the applicable requirements for recipients of federal grant awards.  Defendants will implement the Compliance Plan within one hundred twenty (120) days of the Effective Date of this Stipulation and Order.

7.      WNET.ORG did not participate in any of the conduct described in the Complaint. As EBC's parent and sole member, WNET.ORG agrees to be bound by the terms of this Stipulation and Order as it relates to any injunctive relief and prospective relief, including but not limited to, implementation and adherence to the Compliance Plan, as well as the release, exceptions to release and default provisions.

8.      Subject to the exceptions in Paragraphs 11 and 12 below, in consideration of the obligations of Defendants set forth in this Stipulation and Order, conditioned upon EBC's payment in full of the Settlement Amount, the United States (on behalf of itself and its agencies, departments, officers, employees, servants and agents) agrees to release EBC, its predecessors, successors, parents (including but not limited to WNET.ORG), affiliates, divisions, subsidiaries and all of its current and former officers, directors, trustees and employees (collectively "the Released Persons and Entities") from any civil or administrative monetary claim the United States has or may have against the Released Persons and Entities for the Covered Conduct under

5

the False Claims Act, 31 U.S.C. §§ 3729-3733, or under the common law or equitable theories of fraud or mistake of fact.

9.      EBC, its predecessors, successors, parents (including, but not limited to WNET.ORG), affiliates, divisions, subsidiaries and all of its current and former officers, directors, trustees and employees, agree to release the United States and its agencies, departments, officers, employees, servants and agents from any claims (including attorneys' fees, costs and expenses of every kind and however denominated), which EBC has asserted, could have asserted, or may assert in the future against the United States and its agencies, departments, officers, employees, servants and agents related to the Covered Conduct, the United States' investigation and prosecution thereof and this Stipulation and Order.

10.      This Stipulation and Order is intended to be for the benefit of the parties only, and by this instrument the parties to this Stipulation and Order do not release any claims against any other person or entity, except as expressly provided by this Stipulation and Order.

11.      Notwithstanding any term of this Stipulation and Order, including the release provided in Paragraph 8, and the forbearance set forth in Paragraph 4, any and all of the following are specifically reserved and excluded from the scope and terms of this Stipulation and Order as to any entity or person:

        a.      any civil, criminal or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code);

        b.      any criminal liability;

        c.      except as explicitly stated in this Stipulation and Order, any administrative

6

liability, including suspension or exclusion from participating in transactions with the United States;

        d.      any liability to the United States (or its agencies) for any conduct other than the Covered Conduct or the claims for reimbursement for such portion of the expenses previously incurred with respect to the Exhibit B grants as set specifically forth in Paragraph 4;

        e.      any claims based upon such obligations as are created by this Stipulation and Order; and

        f.      any liability to the United States of any entity or person, including but not limited to any joint tortfeasor, that or who is not released by the terms of this Stipulation and Order.

        12.      In the event of a criminal prosecution or administrative action relating to the Covered Conduct, EBC waives and will not assert any defenses it may have based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Stipulation and Order bars a remedy sought in such criminal prosecution or administrative action. This Stipulation and Order is not punitive in purpose or effect.

        13.      Nothing in this Stipulation and Order constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue Code, Title 26 of the United States Code.

        14.      Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of Defendants, their predecessors,

7

successors, parents, affiliates, divisions and subsidiaries in connection with the following shall be Unallowable Costs with respect to any request for reimbursement, cost report, cost statement, information statement or payment request submitted by Defendants to the United States or its designated agent related to Defendants' programs:

      a.    the matters covered by this Stipulation and Order;

      b.    the United States' audit(s) and civil and any criminal investigation(s) of the matters covered by the Complaint in this action, and this Stipulation and Order;

      c.    Defendants' investigation, audit, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and any criminal investigation(s) in connection with the matters covered by the Complaint, and this Stipulation and Order (including attorneys' fees);

      d.    the negotiation and performance of this Stipulation and Order; and

      e.    the payment of the Settlement Amount by EBC to the United States.

      Future Treatment of Unallowable Costs:  These Unallowable Costs shall be separately determined and accounted for by Defendants in nonreimbursable cost centers, and Defendants will not charge such Unallowable Costs directly or indirectly to any grant or contract with the United States, or seek payment for such Unallowable Costs through any request for reimbursement, cost report, cost statement, information statement or payment request submitted by Defendants to the United States or its designated agent related to Defendants' programs.

      Treatment of Unallowable Costs Previously Submitted for Payment: Except as set forth in Paragraphs 4 and 5, Defendants further agree that within sixty (60) days of the effective

date of this Stipulation and Order, they will identify to the United States or its designated agent, if applicable, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, including, but not limited to, payments sought in any requests for reimbursement, cost reports, cost statements, information statements or payment requests already submitted by Defendants to the United States or its designated agent, and will request, and agree, that such requests for reimbursement, cost reports, cost statements, information statements or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. Defendants agree that the United States will be entitled to recoup from Defendants any overpayment as a result of the inclusion of such Unallowable Costs on previously-submitted requests for reimbursement, cost reports, cost statements, information statements or payment requests. Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies.

The United States reserves its rights to disagree with any calculations submitted by Defendants on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Defendants' requests for reimbursement, cost reports, cost statements, information statements or payment requests.

15. Nothing in this Stipulation and Order shall constitute a waiver of the rights of the United States to examine or reexamine the Unallowable Costs described in Paragraph 14.

16. EBC expressly warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(A) and (B)(ii)(I),

9

and will remain solvent following its payment of the Settlement Amount to the United States hereunder. Further, the parties expressly warrant that, in evaluating whether to execute this Stipulation and Order, they (i) have intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to EBC, within the meaning of 11 U.S.C. § 547(c)(1); and (ii) have concluded that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.

17.     Further, the parties warrant that the mutual promises, covenants and obligations set forth herein are intended to and do constitute a reasonably equivalent exchange of value which is not intended to hinder, delay or defraud any entity to which EBC was or became indebted on or after the date of this transfer, all within the meaning of 11 U.S.C. § 548(a)(1).

18.     Each party to this Stipulation and Order shall bear its own legal and other costs incurred in connection with this matter, including costs incurred in connection with the preparation and performance of this Stipulation and Order.

19.     This Stipulation and Order is governed by the laws of the United States. The parties agree that the exclusive jurisdiction and venue for any dispute arising between the parties under this Stipulation and Order as it relates to this action will be the United States District Court for the Southern District of New York.

20.     This Stipulation and Order constitutes the complete agreement between the parties. This Stipulation and Order may not be amended except by written consent of the United States and Defendants.

21.     Subject to the exceptions in Paragraphs 11 and 12, in consideration of the

10

obligations of Defendants in this Stipulation and Order, conditioned upon EBC's timely full payment of the Settlement Amount, this action shall be dismissed with prejudice as to all claims the United States has asserted based on the Covered Conduct, and to the extent of, and as governed by, this Stipulation and Order. This is provided, however, that the Court shall retain jurisdiction over this Stipulation and Order and each party to the extent the obligations herein remain unsatisfied by that party.

      22.      The undersigned person(s) signing this Stipulation and Order on behalf of EBC and WNET.ORG, respectively, represent and warrant that he/she/they are authorized by EBC and WNET.ORG, respectively, to execute this Stipulation and Order. The undersigned United States signatory represents that she is signing this Stipulation and Order in her official capacity.

      23.      This Stipulation and Order may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

      24.      The effective date of this Stipulation and Order is the date on which this Stipulation and Order is entered by this Court.

11

Dated: New York, New York
      June 15, 2010

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for United States of America

By:    /s/ Lara C. Light

LARA K. ESHKENAZI
SARAH E. LIGHT
Assistant U.S. Attorneys
86 Chambers Street – 3rd Floor
New York, New York 10007
Tel. No.: (212) 637-2758, 2774
Fax No.: (212) 637-2702
Email: lara.eshkenazi@usdoj.gov
Email: sarah.light@usdoj.gov

12

Dated: New York, New York
     June 14, 2010

EDUCATIONAL BROADCASTING
CORPORATION

By:

Dated: New York, New York
     June 14, 2010

WNET.ORG

By:

Dated: New York, New York
     June 15, 2010

ARNOLD & PORTER LLP
Attorneys for EBC and WNET.ORG

By:

CRAIG A. STEWART, ESQ.
399 Park Avenue
New York, NY 10022
Tel. No.: (212) 715-1142
Fax No.: (212) 715-1399
Email: craig.stewart@aporter.com

SO ORDERED:

UNITED STATES DISTRICT JUDGE

6 - 15 - 10

13

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
                                    :     ECF Case

UNITED STATES OF AMERICA,        :

                                      :     10 Civ. _____

        Plaintiff,              :

                                      :

        v.                       :     JUDGMENT

                                        :

EDUCATIONAL BROADCASTING    :
CORPORATION and WNET.ORG,     :

                                      :

                                      :

        Defendants.          :
---------------------------------------------------------x

WHEREAS, the United States of America (the "Government") filed its Complaint in this

action on June 15, 2010, and defendants Educational Broadcasting Corporation ("EBC") and

WNET.ORG (collectively with EBC, "defendants") were duly served with a copy of the

Complaint, and have accepted service thereof;

WHEREAS, on or about June 15, 2010, the parties hereto entered into a Stipulation and

Order of Settlement and Dismissal (the "Stipulation") resolving all of the claims alleged in the

Government's Complaint against the defendants, and presented such Stipulation to the Court;

WHEREAS, on or about June ___, 2010, this Court signed the Stipulation and;

WHEREAS, EBC has failed to pay the Settlement Amount, as defined in the Stipulation,

within three (3) business days of the date of entry of the Stipulation, as required, accordingly, it is

so ordered;

NOW, THEREFORE, it is hereby ORDERED AND ADJUDGED as follows:

1.     The United States shall have judgment against the defendant EBC in the sum of nine hundred fifty thousand dollars ($950,000), to be paid in accordance with the terms of the Stipulation, and the United States shall have execution therefor.

2.     The above-captioned action is dismissed with prejudice, without costs or fees to either party.

Dated:      New York, New York
            _____, 2010

                                    _____
                                    CLERK OF COURT

EDUCATIONAL BROADCASTING CORPORATION
SCHEDULE OF FEDERAL AWARDS

Exhibit B

| | NEA PROJECT | ORIGINAL GRANT AMOUNT | ADJ GRANT AMOUNT | ADJ GRANT BALANCE | UNREIMBURSED EXPENSES INCURRED | UNREIMBURSED EXPENSES ADJUSTED @ 87% (FUNDS TO BE DRAWN) | AMOUNT TO BE DEOBLIGATED | AWARD FUNDS AVAILABLE FOR SUBSEQUENT EXPENSES |
|---|---|---|---|---|---|---|---|---|
| 1 | Great Performances 37 (09/10) 08-3446-7107 | $565,000 | $565,000 | $565,000 | $283,000 | $246,210 | $36,790 | $282,000 |
| 2 | Great Performances 36 (08/09) 07-3446-7152 | $525,000 | $525,000 | $525,000 | $462,000 | $401,940 | $60,060 | $63,000 |
| 3 | Great Performances 35 (07/08) 06-3446-7120 | $525,000 | $483,000 | $116,296 | $116,296 | $101,178 | $15,118 | $0 |
| 4 | American Masters 20 (06/07) 05-3446-7128 | $625,000 | $625,000 | $217,097 | $217,097 | $188,874 | $28,223 | $0 |
| 5 | American Masters 21 (07/08) 06-3446-7130 | $525,000 | $437,483 | $335,452 | $335,451 | $291,842 | $43,609 | $0 |
| 6 | American Masters 22 (08/09) 07-3446-7115 | $525,000 | $409,500 | $409,500 | $380,835 | $331,326 | $49,509 | $28,665 |
| 7 | Music Instinct 04-3446-4154 | $80,000 | $80,000 | $80,000 | $64,800 | $56,376 | $8,424 | $15,200 |
| 8 | Make 'em Laugh 06-3446-7119 | $140,000 | $140,000 | $140,000 | $140,000 | $121,800 | $18,200 | $0 |
| 9 | Paris: The Luminous Years 06-3446-7113 | $45,000 | $45,000 | $45,000 | $27,450 | $23,882 | $3,569 | $17,550 |
| | sub-total | $3,555,000 | $3,309,983 | $2,433,345 | $2,026,929 | $1,763,428 | $263,501 | $406,416 |

Exhibit B

EDUCATIONAL BROADCASTING CORPORATION
SCHEDULE OF FEDERAL AWARDS

| | NEH PROJECT | ORIGINAL GRANT AMOUNT | ADJ GRANT AMOUNT | ADJ GRANT BALANCE | UNREIMBURSED EXPENSES INCURRED | UNREIMBURSED EXPENSES ADJUSTED @ 87% (FUNDS TO BE DRAWN) | AMOUNT TO BE DEOBLIGATED | AWARD FUNDS AVAILABLE FOR SUBSEQUENT EXPENSES |
|---|---|---|---|---|---|---|---|---|
| 10 | Paris: The Luminous Years TI-50071-07 | $800,000 | $800,000 | $800,000 | $488,000 | $424,560 | $63,440 | $312,000 |
| 11 | Harlem In Montmarte GN-50079-05 | $800,000 | $800,000 | $800,000 | $744,000 | $647,280 | $96,720 | $56,000 |
| 12 | Picturing America TR-50028-08 | $30,000 | $15,000 | $15,000 | $15,000 | $13,050 | $1,950 | $0 |
| 13 | Picturing America TR-50029-09 | $700,000 | $700,000 | $700,000 | $70,000 | $60,900 | $9,100 | $630,000 |
| | sub-total | $2,330,000 | $2,315,000 | $2,315,000 | $1,317,000 | $1,145,790 | $171,210 | $998,000 |

Exhibit B

**EDUCATIONAL BROADCASTING CORPORATION**
**SCHEDULE OF FEDERAL AWARDS**

| | NSF PROJECT | ORIGINAL GRANT AMOUNT | ADJ GRANT AMOUNT | ADJ GRANT BALANCE | UNREIMBURSED EXPENSES INCURRED | UNREIMBURSED EXPENSES ADJUSTED @ 87% (FUNDS TO BE DRAWN) | AMOUNT TO BE DEOBLIGATED | AWARD FUNDS AVAILABLE FOR SUBSEQUENT EXPENSES |
|---|---|---|---|---|---|---|---|---|
| 14 | Cyberchase Series - 6 DRL-0638962 | $1,500,000 | $1,455,000 | $275,678 | $275,678 | $239,840 | $35,838 | $0 |
| 15 | Cyberchase Series - 7 DRL-0741663 | $1,720,000 | $1,720,000 | $1,720,000 | $1,720,000 | $1,496,400 | $223,600 | $0 |
| 16 | Children's Learning DRL-0723829 | $1,321,266 | $1,289,208 | $1,066,786 | $853,429 | $742,483 | $110,946 | $213,357 |
| 17 | Human Spark ESI-0541489 | $1,300,000 | $1,300,000 | $1,096,241 | $564,993 | $491,544 | $73,449 | $531,248 |
| 18 | Music Instinct DRL-0917652 | $1,296,318 | $1,296,318 | $1,296,318 | $1,050,018 | $913,516 | $136,502 | $246,300 |
| | sub-total | $7,137,584 | $7,060,526 | $5,455,023 | $4,464,118 | $3,883,783 | $580,335 | $990,905 |
| | Total | $13,022,584 | $12,685,509 | $10,203,368 | $7,808,047 | $6,793,001 | $1,015,046 | $2,395,321 |

## EXHIBIT C

### Compliance Plan

### I.     Preamble

1.      The Educational Broadcasting Corporation, its predecessors, successors, parents (including, but not limited to, WNET.ORG), affiliates, divisions, and subsidiaries (collectively, "EBC") agree, as a term of its attached Settlement Agreement with the United States to which this is incorporated by reference, to implement a Compliance Program to ensure compliance with the terms and conditions applicable to any National Science Foundation ("NSF"), National Endowment for the Humanities ("NEH"), and National Endowment for the Arts ("NEA") awards; to ensure compliance with all relevant laws, regulations, and conditions governing NSF, NEH and NEA awards ("Covered Awards"), as now or hereafter amended; and to demonstrate EBC's commitment to the prevention of fraud, false statements, and misuse of funds related to Covered Awards by EBC, its officers, and relevant employees.  The Compliance Program shall be based upon an assessment of the potential for such unlawful activities, have adequate financial and human resources, and be maintained so as to ensure that EBC and each of its officers, and relevant employees maintain the integrity required of a recipient of Covered Awards.

2.      Relevant employees are Principal Investigators ("PIs"), co-PIs, independent contractors, sub-recipients, Project Directors, Institutional Grant Administrators, and any other person who is responsible for the design, conduct, administration, or other activity funded or supported by Covered Awards.

3.      Covered Awards herein mean any cooperative agreement, grant, contract, sub-contract or other instrument whereby EBC receives NSF, NEH and NEA funds.

### II.    Requirements

4.      The period of future compliance obligations assumed by EBC under the Compliance Plan will commence on the date the final signatory executes the Settlement Agreement to which this Compliance Plan is attached and incorporated (the "Effective Date") and will be complete after receipt and written approval of the fifth (5th) and final annual report.

5.      The scope of the Compliance Plan shall be limited to any NSF, NEH and NEA-funded activities taking place during the term of this Compliance Plan and NSF, NEH and NEA funds awarded or disbursed during the compliance period.  NSF Office of Inspector General ("OIG"), NEH OIG, and NEA OIG (hereafter, "Covered OIGs") shall monitor compliance with the requirements of this Compliance Plan as it pertains to Covered Awards.

6.      All reports and notifications required under this Compliance Plan shall be sent electronically to the NSF OIG Associate Inspector General for Investigations, via email to oig@nsf.gov, and NSF OIG will distribute to the Covered OIGs.

### A.    Compliance

7.    EBC agrees to implement the following measures within one hundred twenty (120) days of the Effective Date, unless otherwise specified below:

#### i. Compliance Program

8.    The Compliance Program shall identify all EBC employees who are working on Covered Awards. Each of those employees' roles and responsibilities shall be described so that their relationship to EBC's responsibilities under Covered Awards is clear.  The lines of responsibility shall be clearly established from each individual position up to and including EBC's responsible signatory officials. All individuals in such positions will be provided with (or have electronic access to) written policies and/or procedures applicable to their positions for:

>    (a)    a code of conduct holding EBC personnel to high ethical standards of professional conduct and integrity, including addressing conflicts of interests;
>
>    (b)    accurate time and effort reporting;
>
>    (c)    accurate charging of costs;
>
>    (d)    accurate monitoring, managing, and reporting of cost sharing (which shall mean costs as shared among funders, including the Covered Agencies, but not limited to them);
>
>    (e)    accurate monitoring of sub-recipients and consultants, and sub-recipient and consultant charges;
>
>    (f)    accurate reconciliation of accounting records; and
>
>    (g)    document management and retention.

Individuals in such positions are responsible for the effective implementation of the aforementioned policies and procedures.

#### ii. Compliance Officer

9.    After appropriate screening, EBC shall appoint a senior level administrator to serve as the Compliance Officer for the Compliance Program. The Compliance Officer shall be responsible for Compliance Program operations including, where appropriate, review of awards, development of training programs, and submission of comprehensive written annual reports to NSF OIG on the status of compliance under the Compliance Program. The Compliance Officer shall monitor EBC's internal controls to ensure compliance with all applicable federal laws, regulations, and conditions regarding the use and expenditure of funds under Covered Awards.

### iii. Compliance Committee

10.     The Compliance Officer shall chair a Compliance Committee that shall be responsible for ensuring implementation of the Compliance Program throughout EBC.   In addition to the Compliance Officer, the members of the Compliance Committee shall include appropriately screened officers.

### iv. Written Policies

11.     Within one hundred twenty (120) days of the Effective Date, EBC shall implement written policies regarding its commitment to ensure compliance with all laws, regulations, and conditions related to the receipt of Covered Awards.  These policies shall be adopted by EBC and distributed to all EBC officers and relevant employees. Copies of EBC's written policies will be provided to NSF OIG within thirty (30) days of implementation. They shall be included as part of the annual training, and any policies modified during the term of the Compliance Plan shall be included as part of the annual report sent to NSF OIG.  Such policies shall be updated to reflect any changes in EBC's policies or practices.  EBC's compliance policies shall include disciplinary procedures for dealing with employees who fail to comply with the policies.

### v. Posting and Displaying Fraud Hotline Posters

12.     During the period of the Compliance Plan, EBC shall:

> (a) Prominently display the fraud hotline posters from Covered OIGs in common work areas in which EBC personnel are performing work under any Covered Awards;

> (b) Post on its website an electronic version of these fraud hotline posters in a manner easily accessible to EBC's relevant employees; and

> (c) Request that any subcontractor working on Covered Awards post these fraud hotline posters in its common areas.

### B.     Injunctive Relief

13.     The individual who served as EBC's Director, Contract Management and Financial Control, prior to the adoption of this Compliance Plan is no longer employed by EBC and neither EBC nor any of EBC's affiliates shall re-hire such individual in any capacity in the future.

### C.     Audit Requirements

14.     In addition to the audit requirements contained in OMB Circular A-133, EBC shall engage a qualified external audit firm to conduct, on an annual basis, a comprehensive, statistically valid, independent audit of EBC's compliance with this agreement as well as all

3

applicable federal laws, regulations, and conditions regarding the use and expenditure of funds under Covered Awards ("Independent Compliance Audit" or the "Audit"). This Independent Compliance Audit shall include each component of EBC that receives or has oversight responsibility with respect to Covered Awards and shall be conducted in accordance with Generally Accepted Auditing Standards with a statistically-valid sample. Special attention shall be devoted to risk assessment and internal controls designed to ensure compliance with NSF, NEH, and NEA requirements, including the certifications made on applications, progress reports, financial reports, and other reports related to Covered Awards. The Audit will also assess the efficacy of EBC's compliance program as to whether:

(a)   EBC has established compliance standards and procedures to prevent and detect violations of law;

(b)   EBC's leadership is knowledgeable about such standards and procedures and whether a high-level person is assigned or retained to have responsibility to ensure the implementation and effectiveness of the standards and procedures;

(c)   EBC has made reasonable efforts to exclude from substantial authority any individual who EBC knew or should have known through exercise of due diligence, has a history of engaging in violations of law or other conduct inconsistent with an effective program to prevent and detect violations of law;

(d)   EBC has made reasonable steps to communicate its compliance standards and procedures to relevant employees through effective training programs and other means of disseminating information appropriate to such individuals' respective roles and responsibilities;

(e)   EBC took reasonable steps to ensure that its program to prevent and detect violations of law is followed, to evaluate the effectiveness of the compliance standards and procedures, and to provide a system whereby EBC's employees and agents may report or seek guidance regarding potential or actual violations of law without fear of retaliation, including mechanisms that allow for anonymous reporting;

(f)   EBC's program to prevent and detect violations of law was enforced consistently through appropriate incentives and as necessary disciplinary measures for employees engaging in violations of law or failing to take reasonable steps to prevent or detect violations of law; and

(g)   EBC has taken reasonable steps, when a violation of law was detected, to respond appropriately and to prevent future violations of law, including making any necessary changes to the program for preventing and detecting violations of law.

4

15.     EBC shall provide the first annual report of the Independent Compliance Audit twelve (12) months after the implementation of the Compliance Program specified in paragraphs 7 and 8 above. EBC shall provide all subsequent annual reports of Independent Compliance Audits on the anniversary of the first annual report.

16.     EBC shall provide a working copy of the audit plan to NSF OIG thirty (30) days prior to the initiation of the Independent Compliance Audit. The audit plan will be designed to (1) ensure compliance with the terms and conditions applicable to any Covered Awards, and (2) assess the efficacy of the Compliance Program as outlined above. The Covered OIGs will have the right to require additional procedures if they determine, within ten (10) working days after receiving the advance working copy of the audit plan, that it lacks sufficient detail to ensure accomplishment of (1) and (2) above. EBC shall submit to NSF OIG a copy of the independent auditor's written report and findings as a supplement to the annual written reports required elsewhere in the Compliance Plan. EBC consents to the right of inspection by the Covered OIGs of any final reports or work papers resulting from the Independent Compliance Audit as described above.

17.     Any and all reviews conducted at EBC, which reveal situations that might constitute or indicate noncompliance with NSF, NEH, and/or NEA requirements, are to be timely disclosed to the individual conducting the annual internal audit and the Compliance Officer.

### D.     Annual Written Reports

18.     EBC shall annually provide NSF OIG with a written report identifying deficiencies discovered by the Independent Compliance Audit (described above) or any other audit or review, and the corrective actions EBC has undertaken to address such deficiencies. Such reports shall be due one (1) year after the implementation of the written procedures referred to in paragraphs 7 and 8 above, and on the same date for each of the four (4) years thereafter. These reports shall include a certification by the Compliance Officer that all deficiencies have been addressed to ensure EBC's compliance with all requirements of federal law, regulations, conditions, and the Compliance Plan.

19.     All work papers for the Independent Compliance Audit and other supporting documents for audits or reviews of compliance with the Compliance Plan shall be retained by EBC for eight (8) years after the Effective Date and shall be made available to Covered OIGs upon written request.

20.     A "material" violation or weakness is one that has a significant adverse impact on the administrative, financial, or programmatic aspects of Covered Awards. EBC shall:

(a) Promptly report to NSF OIG every material violation or weakness discovered during any audit or review, remedy the material violation or weakness within thirty (30) days of learning of it, and provide to NSF OIG a written summary of the actions that were taken to correct it; or

5

(b) If EBC is unable to remedy the material violation or weakness within thirty (30) days, EBC shall so inform NSF OIG immediately, provide regular status reports thereafter until the material violation or weakness is cured, and provide to NSF OIG a written summary of the actions that are being taken to correct it.

### E.   Training

21.    EBC shall institute and maintain a comprehensive training program designed to ensure that each officer and employee working on any Covered Awards is aware of all applicable laws, regulations, and standards of conduct that such individual is expected to follow with regard to Covered Awards, and the consequences both to the individual and EBC that will ensue from any violation of such requirements. Each officer and relevant employee shall receive at least two (2) hours of initial training that shall include a discussion of the contents of the Compliance Plan as well as the relevant award requirements, and shall receive additional compliance training of at least two (2) hours on an annual basis. A schedule and topic outline of the training shall be included in the annual report. A certificate shall be placed in the personnel file of each such officer and employee upon completing the training, stating the date, topic, and hours of training received.

### F.   Confidential Disclosure Compliance Program

22.    To the extent permitted by the laws of the State of New York, EBC shall establish a confidential disclosure mechanism enabling EBC and relevant employees to disclose anonymously to the Compliance Officer any practices, procedures, or acts related to Covered Awards deemed by the employee to be inappropriate. EBC shall make the confidential disclosure mechanism known to each officer and employee who is working on any Covered Awards as part of the training described above. EBC shall require the internal review of all such credible disclosures and ensure that proper follow-up is conducted. EBC shall include in its annual report to the Covered OIGs of the Independent Compliance Audit a summary of communications received under the confidential disclosure program, and the results of the internal review and follow-up of such disclosures.

### III.   Inspection, Audit, and Review Rights

23.    In addition to any other right that Covered OIGs have pursuant to applicable award conditions or other authority, they may examine and copy EBC's records for the purpose of verifying and evaluating: (a) EBC's compliance with the terms of the Compliance Plan; and (b) EBC's compliance with any NSF, NEH, and NEA requirements. EBC shall make the records available at any reasonable time for inspection, audit, and/or reproduction. Furthermore, for purposes of this provision, Covered OIGs may interview any EBC employee at the employee's place of business during normal business hours or at such other place and time as may be mutually agreed upon.

24.    In the event that any of the Covered OIGs believes EBC has breached any of its obligations under the Compliance Plan, NSF OIG shall notify the Compliance Officer of the alleged breach electronically or by other appropriate means, specifying the nature and extent of

the alleged breach. EBC will have thirty (30) days from receipt of the notice to: (a) cure said breach; or (b) otherwise satisfy the Covered OIGs that (1) it is in full compliance with the Compliance Plan or (2) the breach cannot be reasonably cured within thirty (30) days, but EBC has taken effective action to cure the breach and is pursuing such action with diligence.

25.     If, at the end of the time period described in paragraph 24, the Covered OIGs determine that EBC continues to be in breach of any of its obligations under the Compliance Plan, NSF OIG shall inform the Compliance Officer of the conclusion that EBC is in default. The Covered OIGs may also take one or both of the following actions: (1) refer the matter to their respective agencies to initiate proceedings to undertake appropriate administrative action, including but not limited to the suspension or termination of any or all NSF, NEH, and NEA awards and/or suspension or debarment of EBC; and/or (2) refer the matter to the United States Attorney's Office for civil enforcement, pursuant to the terms of the Settlement Agreement.

26.     Should any action to enforce or interpret the Compliance Plan or to resolve any dispute hereunder be required, the Parties acknowledge the jurisdiction of the federal courts. The parties agree that, absent a breach of the Compliance Plan and/or the Settlement Agreement to which it is attached and incorporated by reference, the execution of the Settlement Agreement shall be final as to all matters alleged in the Settlement Agreement.

### IV.    Costs

27.     EBC shall bear its own costs, expenses, and fees in relation to implementation of the Compliance Plan.

28.     As set forth in paragraph 14 of the Stipulation and Order, all costs, whether direct or indirect, incurred by or on behalf of EBC in connection with the following are unallowable costs (hereafter, "Unallowable Costs") under the cost principles applicable to government awards (2 C.F.R. Parts 215 and 230): (1) the implementation of the matters covered by this Compliance Plan; (2) the negotiation of this Compliance Plan and the Stipulation and Order (including attorney's fees); and (3) any payments made pursuant to the Stipulation and Order. These Unallowable Costs shall be separately estimated and accounted for by EBC and EBC shall not charge such Unallowable Costs directly or indirectly to any federal awards.

29.     Notwithstanding the foregoing, EBC may be permitted to charge certain allowable costs associated with the administration of the Compliance Plan as "Indirect Costs," pursuant to 2 C.F.R. Part 230, Appendix A, in conjunction with a Federally approved Indirect Cost Rate.

### V.    Modification

30.     Any modification to the Compliance Plan shall not be effective until a written amendment is signed by representatives duly authorized to execute such amendment.

7

## VI.    Integration Clause

31.    This Compliance Plan and the Stipulation and Order to which it is attached and incorporated by reference embody the entire Stipulation and Order and understanding of the Parties with respect to the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants, or undertakings other than those expressly set forth or referred to in the Compliance Plan and the Stipulation and Order.  The Compliance Plan and the attached Stipulation and Order to which it is incorporated by reference, supersedes any and all prior Stipulation and Order and understandings between the Parties with respect to this subject matter.

8